### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRENDA QUINN, as Administrator for the Estate of Travis Frederickson, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 17-669<br>) |
| BRUCE RAUNER, Governor of Illinois, in his official capacity, JOHN BALDWIN, Director of IDOC, in his official capacity, LOUIS SHICKER, Medical Director of IDOC, in his official capacity, WEXFORD HEALTH SOURCES, INC., a Pennsylvania Corporation doing business in the State of Illinois, DR. DAVID, DR. RAZA,  M. KNOPE, LPN, K. IDAMMERSLEY, LCSW, CORRECTIONAL OFFICERS FREDERICO FERNANDEZ, ALEXANDER RODMAN, and CMT ABBY ELDER, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) **JURY DEMANDED** |

### COMPLAINT

NOW COMES Plaintiff, BRENDA QUINN, as Administrator for the Estate of Travis Frederickson, by and through her attorneys, Jared Kosoglad and Louis Meyer, and complaining of the Defendants, BRUCE RAUNER, Governor of Illinois, in his official capacity, JOHN BALDWIN, Director of IDOC, in his official capacity, LOUIS SHICKER, Medical Director of IDOC, in his official capacity, WEXFORD HEALTH SOURCES, INC., a Pennsylvania Corporation doing business in the State of Illinois, DR. DAVID, DR. RAZA, M. KNOPE, LPN, and K. IDAMMERSLEY, LCSW, CORRECTIONAL OFFICERS FREDERICO FERNANDEZ, ALEXANDER RODMAN, and ABBY ELDER, states as follows:

## INTRODUCTION

1. This is a civil action seeking damages against defendants for committing acts under color of law, and depriving Plaintiff of rights secured by the Constitution and laws of the United States.

## JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983, Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658 (1978); the judicial code 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction as provided under U.S.C. § 1367(a).

## SUMMARY

3. Plaintiff alleges, in summary, that Illinois officials made an agreement with Wexford that serves to conceal the inhumane and unconstitutional treatment of prisoners in Illinois, which caused the death of Plaintiff's son.

4. The agreement between the State of Illinois and Wexford serves to create the illusion that medical care is available and provided to persons imprisoned in Illinois facilities.

5. The illusion created by the agreement between Illinois officials and Wexford causes the death of Illinois residents and caused the death of Decedent in this case.

6. Wexford has been named in over a thousand lawsuits variously alleging widespread and specific instances of the failure to provide constitutional medical care.

7. Wexford's failures kill people; Illinois officials know it.  Both Wexford and Illinois officials take people's lives for money.  Travis Frederickson died to save Wexford and the State of Illinois a few dollars.

8. The "doctors" and "nurses" hired by Wexford to provide services to incarcerated persons serve as part of the illusion that reasonable medical care is provided at Illinois prisons.

9. The individual defendants in this case must believe that no one cares about the individuals in their custody because they certainly didn't care about Travis Fredrickson.

## PARTIES

10. BRENDA QUINN is a citizen of the United States of America, who resides in Marion, IL. She is acting administrator of the estate of Travis Fredrickson ("Plaintiff"), and at the time of his death lived at the Pinckneyville Correctional Centers under the umbrella of the Illinois Department of Corrections.

11. Defendant Bruce Rauner ("Rauner") is the Governor of the State of Illinois. He is sued in his official capacity. The Governor is the Chief Executive Officer of the State of Illinois. He is responsible for ensuring the provision of constitutionally adequate medical for all prisoners in the custody of IDOC, and is also responsible for establishing monitoring and other procedures to ensure that IDOC's healthcare vendor, Wexford Health Sources, Inc. ("Wexford") in fact provides the contracted services in a manner which complies with Illinois' Constitutional obligation to provide medical care to Illinois state prisoners. In all his actions described in this complaint, Rauner is acting under color of state law and in the course of his employment.

12. Defendant John Baldwin ("Baldwin") is the Director of IDOC and is sued in his official capacity. As Director of IDOC, Baldwin is responsible for establishing, monitoring, and enforcing overall operations, policies, and practices of the Illinois state prison system, which includes the provision of constitutionally adequate medical care for all prisoners in the custody of IDOC. Baldwin is also responsible for working with Rauner to submit

budgets to the Illinois Legislature that request sufficient resources to comply with IDOC's obligations under the U.S. Constitution. In all his actions described in this complaint, Baldwin is acting under color of state law and in the course of his employment.

13. Defendant Louis Shicker ("Shicker") is the Medical Director for IDOC and is sued in his official capacity. As Medical Director, Shicker is responsible for ensuring that IDOC healthcare policies, directives, and protocols are properly implemented at all facilities; for the oversight of IDOC's "continuous quality improvement" ("CQI") and other healthcare self-monitoring and correction processes; for ensuring that healthcare staff, including vendor staff, are appropriately qualified; for assisting with contract monitoring; and for updating and creating administrative directives, clinic, and health care guidelines. Shicker is also responsible for oversight of the independent contractor, Wexford, hired to provide healthcare personnel and treatment throughout the IDOC system. In all his actions described in this complaint, Shicker is acting under color of state law and in the course of his employment. (Rauner, Baldwin, and Shicker are collectively the "State Defendants.")

14. Defendant WEXFORD HEALTH SOURCES, INC. ("Defendant Wexford") was, at all times relevant hereto, a Pennsylvania Corporation conducting business in the State of Illinois.  Further, WEXFORD contracted with the State of Illinois, under color of law, to provide medical care to persons incarcerated under the Illinois Department of Corrections ("IDOC"), and that this contractual relationship included providing medical services to persons at Shawnee Correctional Center, Jacksonville Correctional Center, and Pinckneyville Correctional Center. It is the principal and employer of the Wexford Defendants.

15. DEFENDANTS DR. DAVID, DR. RAZA, M. KNOPE, LPN, and K. IDAMMERSLEY, LCSW, and ABBY ELDER were, at the time of this occurrence, employees and duly authorized agents of Wexford Health Sources, Inc.  They engaged in the conduct complained of in the course and scope of their employment and under color of law. They are sued in their individual capacities.

16. OFFICERS FREDERICO FERNANDEZ and ALEXANDER RODMAN were, at the time of this occurrence, employees and duly authorized correctional officers for the Illinois Department of Corrections.  They engaged in the conduct complained of in the course and scope of their employment and under color of law.  They are sued in their individual capacities.

## BACKGROUND FACTS

17. In December 2014, a team of medical experts led by Dr. Ronald Shansky issued their report on the healthcare provided to prisoners in the Illinois Department of Corrections ("IDOC").  The Expert's team was unequivocal: "[T]he State of Illinois has been unable to meet minimum constitutional standards with regards to the adequacy of its health care program for the population it serves." See Exhibit 1, Report of Dr. Shansky, p. 45.[1]

18. Chronic understaffing at Illinois prisons is in part to blame.  Since 2010, the John Howard Association has, in a series of reports, detailed the chronic understaffing of medical personnel inside Illinois' prisons.

19. The understaffing is caused by a $1.36 billion contract with Wexford, whereby Wexford and the State Defendants have agreed to understaff the prisons.  Instead of providing

---

[1] The report is the product of a court appointed expert pursuant to F.R.E. 706 in Lippert et al. v. Baldwin, et al., 10-cv-4603, currently pending in the Northern District of Illinois.  Plaintiff credits the work done by Plaintiff's counsel in that case, and, with permission from Alan Mills of the People's Law Office, borrows heavily from their work in this lawsuit.

5

constitutionally adequate medical care, Wexford finds it less expensive to litigate against the prisoners it victimizes, subjecting itself to over a thousand lawsuits alleging inadequate medical care in Illinois alone.

20. Wexford has created a system whereby it profits from leaving healthcare positions open, which in turn results in the death and disability of Illinois inmates because facility staff are unable to attend to and treat the medical needs of inmates. The State Defendants have turned a blind eye and tolerated Wexford's profiteering at the expense of Illinois prisoners.

21. "The leadership vacuums . . . have resulted in process and care breakdowns on a daily basis." See Exhibit 1, p. 6.

22. The State Defendants' Office of Health Services fails to establish specifications for the health care contracts with Wexford and fails to monitor and oversee the performance of those contracts.

23. Wexford employs incompetent persons on a widespread basis, from leadership positions to local medical providers.

24. The report of Dr. Shansky and the John Howard Association reports are chock full of shocking examples of physician incompetence. Plaintiff incorporates those reports here.

25. The incompetence problem is facilitated by a provider performance review process that ranges from weak and conflicted to non-existent. Wexford doctors peer-review each other, creating an inherent conflict of interest between corporate employed physicians.

26. The State Defendants have failed to act in response to repeatedly identified widespread systemic failures in the provision of medical care to inmates.

27. In particular, the intrasystem transfer process is virtually non-existent and endangers prisoners.  <u>See</u> Exhibit 1, p. 14 *et seq.*

28. Dr. Shansky's expert team found virtually every intrasystem transfer record flawed and the process broken.

29. Whatever might have been flawed about the mental health treatment provided to Decedent, the failure to have a meaningful intrasystem transfer process to provide for continuity of care caused Plaintiff to lose her son.

30. The failure to keep organized, intelligible and legible medical records endangers people. This failure reduces reliance on review of the medical record, and had anyone reviewed the significant history of severe mental illness and suicidal ideations, Plaintiff's suicide could have been prevented.

31.  Despite knowing and planning to transfer to an electronic records system, the State Defendants have failed to do so.

32. The State Defendants are well aware of the systemic deficiencies outlined in this Complaint and the numerous other deficiencies repeatedly reported on by neutral experts employing reliable methodologies.  Despite actual knowledge of the deficiencies and the serious risks they pose, the State Defendants have been deliberately indifferent to the inhumane conditions to which the inmates are exposed and have failed to make reasonable efforts to remedy those conditions.

33. As a result, prisoners throughout Illinois have no received adequate access to medical care, subjecting them to unnecessary pain and suffering, with no penological justification, in violation of the Eighth Amendment to the Constitution of the United States.

**FACTS PARTICULAR TO DECEDENT**

34. Decedent suffered from major depressive disorder and other psychological conditions.

35. From 2014-2015, Decedent was on and off again placed on crisis watch and suicide watch at Shawnee Correctional Center, although the record keeping of his medical situation is so poor it cannot be accurately or adequately reconstructed.

36. For example, at Shawnee Correctional Center on May 27, 2015, Decedent, "explained that he was feeling suicidal and verbalized a plan to hang self." See Exhibit 2, 5/27/15 Infirmary Progress Notes.

37. At the time, Drs. David and Raza pretended to serve as Decedent's doctors.

38. Yet, despite Decedent's dire mental health situation, Decedent never spoke with his doctors or received a medical examination from them, even though Decedent's so-called doctors knew of Decedent's dire situation.

39. Both Wexford and the State Defendants are aware that Wexford employs a widespread practice of failing to employ enough well-trained medical staff to address the serious and diverse medical problems suffered by residents at Illinois prisons and that this failure causes the deaths of persons supposed to be under their care.

40. On or about June 1 or 2, 2015, one of Decedent's doctors authorized Decedent's release from the infirmary, through a phone call, knowing or unforgivably oblivious to the fact that unless he was placed on crisis watch or suicide watch at subsequent facilities, Decedent would likely harm himself and carry out his expressed suicidal ideations.

41. On June 2, K. IDAMMERSLEY, LCSW, who served as the crisis team leader at Shawnee Correctional Facility, claims to have conducted a, "chart review of documentation 5/27-6/1/15 w/no concerns noted," even though the chart is rife with

information about severe mental health issues and suicidal ideations. Either Defendant Idammersley did not review the chart or lied about what was in it.

42. As a consequence, on June 2, 2015, Decedent received a transfer from Shawnee Correctional Center to Jacksonville Correctional Center.

43. Neither Defendants David, Raza, or Idammersley followed up with Jacksonville Correctional Center, and Wexford and IDOC have no meaningful policy or practice in place for making sure that inmates receive continuous care from one facility to the next.

44. Accordingly, Decedent never saw a mental health care provider or doctor of any kind at Jacksonville Correctional Center.

45. On June 13, 2015, Decedent was transferred from Jacksonville Correctional Center to Pinckneyville Correctional Center.

46. On June 17, 2015, four days after arriving at Pinckneyville, Defendant N. Knope, LPN, conducted the Reception Screening of Decedent.

47. Despite learning of Decedent's severe mental illness, major depressive disorder, and recent suicidal ideations, Defendant Knope did nothing.

48. Neither Defendants David, Raza, or Idammersley followed up with Pinckneyville Correctional Center, and Wexford and IDOC have no meaningful policy or practice in place for making sure that inmates receive continuous care from one facility to the next.

49. Accordingly, Decedent never saw a mental health care provider or doctor of any kind at Pinckneyville.

50. On June 27, 2015, Decedent committed suicide at Pinckneyville Correctional Center, by wrapping a bed sheet around his neck and the upper bunk, carrying out his repeated threats to hang himself.

51. Defendant Correctional Officers Fernandez and Rodman served as correctional officers from 3:00 – 11:00 p.m. and 11:00 p.m. until the time of his death, and during that time learned that Decedent suffered from severe mental health problems and meant to harm himself.

52. Defendant Elder learned that Decedent suffered from severe mental health problems and meant to harm himself through suicide when she delivered medications to Decedent for two days prior to his death, and took no action.

53. Prior thereto, Defendants Fernandez, Rodman, and Elder learned that Decedent was suffering from an objectively serious mental health problem and turned a blind eye. Had any of them referred Decedent for assistance, Decedent would still be alive.

54. As a direct and proximate result of Defendants' conduct, Plaintiff lost his life, and suffered the deprivation of his constitutional rights and dignity in the process of doing so.

### COUNT I: 42 U.S.C. § 1983 – Denial of Medical Care
### Against Each Of The Individual Defendants

55. Plaintiff re-alleges the above paragraphs as though fully set forth herein.

56. As described more fully above, each Defendant had notice of Plaintiff's objectively serious medical condition.

57. Despite Defendants' notice, they failed to provide Plaintiff with necessary medical attention, in violation of the Eighth Amendment to the United States Constitution.

58. As a result of the unjustified and unconstitutional conduct of Defendants, Plaintiff experienced pain, suffering, emotional distress, injury, and death.

59. The misconduct of Defendants was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of Plaintiff.

60. Alternatively, Defendants were deliberately indifferent to Plaintiff's objectively serious medical needs, and their acts were undertaken intentionally with malice, willfulness, and deliberate indifference to the rights of Plaintiff.

61. Plaintiff was harmed as a result of the unconstitutional conduct of Defendants including, but not limited to, severe pain, physical injury, mental suffering, anguish and humiliation, and loss of life.

WHEREFORE, pursuant to 42 U.S.C. § 1983, PLAINTIFF demands judgment against the Individual Defendants for compensatory damages, punitive damages, the costs of this action and attorneys' fees, and any such other and further relief as this Court deems equitable and just.

## COUNT II: 42 U.S.C. § 1983 – Monell
### Against Defendant WEXFORD and the State Defendants

62. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

63. At all times relevant, Plaintiff enjoyed and possessed a right under the Eighth Amendment to receive necessary medical treatment for his serious medical condition.

64. Plaintiff's injuries were proximately caused by policies and practices on the part of Defendant Wexford and the State Defendants.

65. From 2010 to 2015, and for a period of time prior thereto, Defendant Wexford and the State Defendants had notice of a widespread practice by its employees at Shawnee Correctional Center, Jacksonville Correctional Center, and Pinckneyville Correctional Center under which medical staff were indifferent to detainees with serious medical conditions.

66. Wexford and the State Defendants have a widespread practice and policy failing to provide for continuity of care in the event an inmate transfers between Department of Corrections facilities.

67. The widespread problems alleged in ¶¶17-33 of this Complaint all contributed to Decedent's death.

68. The widespread practice is allowed to flourish because Defendant Wexford, directly encourages and is thereby the moving behind, the very type of misconduct at issue by failing to adequately train, supervise, and control medical personnel, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

69. Pursuant to its contractual relationship with the State Defendants, Defendant Wexford had a constitutional obligation to maintain and provide adequate and appropriate medical evaluations and treatments for incarcerated patients at Shawnee Correctional Center, Jacksonville Correctional Center, and Pinckneyville Correctional Center.

70. In this way, Defendant Wexford violated Plaintiff's rights by maintaining policies and practices that were the moving force for the foregoing constitutional violations.

71. The above-described widespread practice, so well-settled as to constitute de facto policy in Shawnee Correctional Center, Jacksonville Correctional Center, Pinckneyville Correctional Center, and among Wexford employees, were able to exist and thrive because governmental policymakers with authority over the same, namely, Defendant Wexford, respectively, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

72. Plaintiff's injuries were caused by employees of Defendant Wexford and the State Defendants, including but not limited to the individually named Defendants, who acted pursuant to Defendant Wexford's policies and practices in engaging in the misconduct described in this Count.

WHEREFORE, pursuant to Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658 (1978), and 42 U.S.C. § 1983, Plaintiff demands judgment against Defendant Wexford for compensatory and punitive damages, against the State Defendants for compensatory damages, the costs of this action and attorneys' fees, and any such other and further relief as this Court deems equitable and just.

### COUNT III: 42 U.S.C. § 1983 – Conspiracy
### Against Defendant WEXFORD and the State Defendants

73. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

74. At all times relevant, Plaintiff enjoyed and possessed a right under the Eighth Amendment to receive necessary medical treatment for his serious medical condition.

75. Defendants Wexford and the State Defendants entered into an express contract that the Defendants know causes chronic and widespread medical problems for inmates at Illinois institutions.

76. While the contract itself does not violate the Constitution, Defendant Wexford and the State Defendants have an unwritten agreement to violate the Constitution through knowingly providing inadequate medical care to inmates in Illinois prisons.

77. The above described unwritten agreement has caused untold harm and death in Illinois prisons, in violation of the Eighth Amendment to the United States Constitution.

78. Plaintiff's son, the Decedent, died because of the unwritten agreement between Wexford and the State Defendants to provide inadequate medical care to inmates in Illinois prisons.

WHEREFORE, pursuant to Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658 (1978), Plaintiff demands judgment against Defendant Wexford for compensatory damages, the costs of

this action and attorneys' fees, and any such other and further relief as this Court deems equitable and just.

## COUNT IV: 42 U.S.C. § 12132 – Americans With Disabilities Act
### Against All Defendants

79. Plaintiff realleges each of the foregoing paragraphs as if fully set forth here.

80. As described more fully in the preceding paragraphs, Decedent lived with major depressive disorder and an anxiety disorder is a qualified person with a disability under the Americans with Disabilities Act, and his disability was known to the Defendants.

81. Defendants had specific knowledge of Plaintiff's severe mental illness and suicidal ideations.

82. As a result, the Defendants had an obligation to accommodate his disability by housing him in a suicide-proof cell. The Defendants intentionally failed to accommodate Decedent's disability, and these failures led to Decedent's death.

WHEREFORE, pursuant to 42 U.S.C. § 12132, PLAINTIFF demands judgment against the Individual Defendants and Wexford for compensatory damages, punitive damages, the costs of this action and attorneys' fees, against the State Defendants for compensatory damages, the costs of this action and attorneys' fees, and any such other and further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

                                                       Respectfully Submitted,
                                                       BRENDA QUINN

                                            By:   s/Jared S. Kosoglad_____

                Jared Kosoglad
                JARED S. KOSOGLAD, P.C.
                223 W. Jackson, Suite 200
                Chicago, IL 60606
                T: 312-513-6000
                E: jared@jaredlaw.com