## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRENDA QUINN, as Administrator for
the Estate Of Travis Frederickson,

               Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
DR. ALFONSO DAVID, DR. SYED
RAZA, NANCY KNOPE LPN, ABBY
ELDER CMT, KRISTEN HAMMERSLY
LCSW, FEDERICO FERNANDEZ, and
ALEXANDER RODMAN,

               Defendants.

Case No. 3:17-CV-00669-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

      Pending before the Court is a Motion for Summary Judgment filed by Defendants

Wexford Health Sources, Inc. ("Wexford"); Dr. Alfonso David ("David"); Dr. Syed Raza

("Raza"); Nancy Knope, LPN ("Knope"); and Abby Elder, CMT ("Elder") (Doc. 109); a

Motion for Summary Judgment filed by Defendants Kristen Hammersly ("Hammersly"),

Federico Fernandez ("Fernandez"), and Alexander Rodman ("Rodman") (Doc. 108); and

a Motion to Exclude the Expert Report and Testimony from Hammersly, Fernandez, and

Rodman (Doc. 111). For the reasons set forth below, the Court grants the Motions for

Summary Judgment and dismisses as moot the Motion to Exclude the Expert Report and

Testimony.

This case arises out of the suicide of Travis Frederickson ("Frederickson") during his incarceration at Pinckneyville Correctional Center, an Illinois Department of Corrections ("IDOC") facility. Frederickson was incarcerated at a number of facilities operated by IDOC between 2012 and 2015, during which time he received mental health care from Wexford, a private contractor that provides such services through a contract with IDOC. Following Frederickson's suicide, the Administrator of his estate, Plaintiff Brenda Quinn ("Quinn"), brought this action under the Civil Rights Act, 42 U.S.C. § 1983 (Doc. 38). Quinn alleges that the individual defendants showed deliberate indifference to Frederickson's serious medical needs during his incarceration, leading to mental anguish and loss of life in violation of the Eighth Amendment (*Id.*). Quinn further claims that Wexford violated Frederickson's constitutional rights through alleged policies that resulted in failures to provide continuity of care during inmate transfers between IDOC facilities, violating the Eighth Amendment (*Id.*). Lastly, Quinn claims that Wexford was party to an unwritten, express agreement with the State of Illinois to violate the Constitution by knowingly providing inadequate medical care to inmates in Illinois prisons (*Id.*).

## EVIDENTIARY MATTERS

Before reviewing the factual record, the Court must first resolve a number of evidentiary questions raised by the parties in their filings regarding the Motions for Summary Judgment and the separate Motion to Exclude the Export Report and Testimony.

In her response to Defendants' Motions for Summary Judgment, Quinn has objected to the admission of certain portions of Frederickson's prison medical records, namely parts of Dr. Raza's and Dr. David's medical notes and Frederickson's Medication Administration Record from Pinckneyville Correctional Center ("Pinckneyville") (Doc. 118 at 2–8, 11, 16). Quinn has further objected to the admission of portions of the Report of Investigation (Doc. 118-7) prepared by IDOC after Frederickson's death (Doc. 118 at 14). In their Reply, Defendants Wexford, David, Raza, Knope, and Elder objected to admission of the Report of Dr. Ronald Shanksy ("Shanksy Report") and also objected to the admission of certain statements by Amanda Smith, Dr. Matticks, Defendant Hammersly, Dr. Reister, Michael Williams, and Willie White, among others (Doc. 120 at 3, 5, 7–12). Defendants Wexford, David, Raza, Knope, and Elder have separately moved to exclude expert testimony from Dr. Kathryn A. Burns (Doc. 112).

Before summarizing the facts underlying this action, the Court will first address the admissibility of (1) Frederickson's prison medical records, including doctors' notices and medication records; (2) testimony from the Report of Investigation; and (3) evidence objected to by Defendants.

*1. Frederickson's Prison Medical Records*

Defendants rely extensively on handwritten notes by Defendant Raza and other Wexford employees taken from Frederickson's medical records and also cite Frederickson's Medication Administration Record. Quinn argues that Defendants have not laid sufficient foundation for these medical records and that the exhibit containing them should be stricken, citing *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), for the

proposition that a statement of facts should be stricken if it "fail[s] to cite the record and [is] filled with irrelevant information, legal arguments, and conjecture[.]" That case dealt with Local Rule 56.1 of the Northern District of Illinois, and it is inapposite in this situation. When introducing evidence to support a motion for summary judgment, parties must make a showing that such evidence would be admissible at trial—thus, Federal Rule of Evidence 901 on authentication of evidence applies. Federal courts may consider materials that might be inadmissible at trial, however, so long as facts therein could later be presented in an admissible form. *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Furthermore, Federal Rule of Evidence 901(b)(4) provides that the authentication requirement may be satisfied where items of evidence have "distinctive characteristics" that serve to identify them to the court, such as "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."

Courts in the past have frowned upon mere *pro forma* objections based on authenticity without any indication that the evidence may not in fact be genuine. Prison medical records have been found admissible in the past based on Federal Rule of Evidence 901(b)(4). *See, e.g., Currie v. Bannister*, 2016 U.S. Dist. LEXIS 184339 at *11–13 (D. Nev. Nov. 15, 2015) (finding that "the court is quite familiar with the way [the Nevada Dept. of Corrections] keeps its records and … does not see any issues with their genuineness."); *Johnson v. Sweeney*, 2015 U.S. Dist. LEXIS 139305 at *25–26 (E.D. Cal. Oct. 13, 2015). As in those cases, this Court is familiar with IDOC medical records—in the absence of any indication that there are real doubts as to the genuineness of the records,

the Court finds that they are sufficiently authenticated, or in the alternative that they could easily be presented in an admissible form with an accompanying affidavit. Accordingly, they will be treated as admissible.

2. *Report of Investigation*

After Frederickson's death, IDOC conducted an investigation, resulting in an investigative report which includes descriptions of statements made to investigators by Frederickson's cellmate and other inmates in the vicinity, as well as IDOC and Wexford staff (Doc. 110-5). Quinn has objected to the use of these descriptions of statements as hearsay, arguing that pertinent sections of Defendants' briefs should be stricken (Doc. 118 at 15).

Similar reports compiled by prison officials have been ruled admissible under the business records exception to hearsay or alternatively the residual exception to the hearsay rule. *Moffett v. McCauley*, 724 F.2d 581, 584 (7th Cir. 1984) (citing cases in which prison reports found admissible under Federal Rules of Evidence 803(6) and 807). While the investigative report does not appear to be certified in a manner that would allow it to be admissible under the business records exception, the residual exception appears to be applicable. Under the residual exception, a hearsay statement will be admissible if (1) the totality of the circumstances in which it was made and the evidence supporting the statement provide sufficient guarantees of trustworthiness and (2) the hearsay statement is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. FED. R. EVID. 807. Here, the records are clearly marked as an investigation report produced for IDOC, and summaries of

individual statements are signed by the investigator and the individuals who made them. The interviews appear to have been conducted within a month after Frederickson's suicide, and any affidavits based on present recollections of these events would be less probative than these statements taken when memories were fresh. It is worth noting that Quinn has also relied on different passages from the same Report of Investigation in her own filings, indicating that they have some probative value. The Court finds that the investigation report would be admissible at trial and can be referred to in considering Defendants' Motions for Summary Judgment.

      3.     *Defendants' Objections and Motion to Exclude*

Defendants have objected to certain individuals' deposition testimony as immaterial, irrelevant, or not probative of matters asserted. Defendants have separately moved to exclude Dr. Burns' proposed testimony, arguing that it contains testimony that is irrelevant, based on improper standards and irrelevant information, and is unreliable, inconsistent and not sufficiently supported. Defendants have further objected to the Shanksy Report, arguing that it lacks foundation and is not related to the facts of the case.

The Court agrees that Quinn has made broad generalizations based on isolated statements from individuals, taken out of context, and that Dr. Burns' testimony is of limited probative value. As a court filing, the Court would be inclined to find that the Shanksy report has sufficient foundation, though it agrees that it is of limited probative value in this action. But because the Court has determined that it would grant summary judgment to all defendants even if all of this evidence was admissible and viewed in the light most favorable to Quinn, the Court will treat the evidence as if it were admissible

for the purposes of its analysis and will not address Defendants' objections and Motion to Exclude at this time.

FACTUAL & PROCEDURAL BACKGROUND

The parties agree that Frederickson already had a history of mental illness upon incarceration and that he had told Wexford of a suicide attempt in 2000 or 2001 and a psychiatric hospitalization in that same period (Doc. 110-1 at 2, 50). Frederickson entered Shawnee Correctional Center ("Shawnee") in December 2012, and a few months later, in February 2013, he attempted to commit suicide by hanging himself while his cellmate was out of the cell for lunch (*Id.* at 66–67).

Later on the day of Frederickson's 2013 suicide attempt, Dr. Raza met with Frederickson, diagnosed him as depressive, placed him on 10-minute suicide watch, and began a course of medication (*Id.* at 68, 132). From the time of this 2013 incident until June 2015, Frederickson had numerous interactions with Dr. Raza and with other mental health practitioners ("MHPs") employed by Wexford.

While the Court agrees with Quinn that Dr. Raza's notes are at times challenging to read, the Court feels that it is not necessary to confirm every granular detail discussed in those notes. Rather, for the purpose of the analysis in this order, it is sufficient to observe that the notes clearly show that Dr. Raza met with Frederickson regularly during the course of his incarceration at Shawnee, heard his complaints and documented his changing condition, adjusting his medication according to his own diagnoses and feedback from Frederickson. (Doc. 110-1 at 73, 138–163). Frederickson also met with MHPs, including Amanda Smith and Defendant Hammersly, on multiple occasions

during his time at Shawnee, sometimes in conjunction with Dr. Raza and sometimes separately. In addition to meeting with MHPs, Frederickson's medical status was assessed by Defendant Dr. David, who responded to Frederickson's complaints of allergies, prescribing a treatment and noting Frederickson's mental health status (*Id.* at 119). MHPs adjusted Frederickson's watch status based on their observations of his condition (*Id.* at 1–10, 27, 39, 42, 101, 104–05, 108–12, 122–125, 153). Hammersly, a Licensed Clinical Social Worker, supervised MHPs at Shawnee, but did not provide direct treatment to inmates (Doc. 108-1 at 4–5).

On June 3, 2015, Frederickson was transferred from Shawnee to Jacksonville Correctional Center ("Jacksonville") at his own request in order to participate in a substance abuse treatment program (*Id.* at 24; Doc. 110-1 at 98). Frederickson had been removed from crisis watch on June 1, and at the time of his transfer, medical and mental health staff at Shawnee thought that he was in high spirits and not at risk of suicide (Doc. 108-1 at 26). Frederickson was still deemed to be "Seriously Mentally Ill," however, and he was described as such in an email sent between staff at Shawnee and Jacksonville (Doc. 120-3 at 14). Because of his mental health status, Frederickson required more therapeutic attention than other offenders in order to remain stable on and off crisis watch (Doc. 118-3 at 20). At the time of transfer, a transfer screening, which included a description of Frederickson's prescription medications and recent suicide watch status, was performed at Shawnee (Doc. 110-1 at 98). This was followed by a reception screening at Jacksonville, which noted his current medications (*Id.*). Frederickson also received an evaluation of suicide potential conducted shortly after his arrival at Jacksonville (*Id.* at

43–44). Frederickson was scheduled to have a follow-up appointment seven days after his removal from crisis watch on June 1. Because of his transfer, this appointment did not occur, though he was seen by MHPs upon his arrival at Jacksonville for his reception screening and suicide potential evaluation (*Id.*; Doc. 118-1 at 50).

While at Jacksonville, Frederickson was placed in segregation, at which time he wrote two letters to Quinn, which Quinn then faxed to Shawnee. In the first letter, Frederickson described a needle being found in his clothing upon arrival at Jacksonville and surmised that he would be transferred somewhere "far worse" as punishment. He expressed that being in Jacksonville for drug treatment was a matter of "life and death" for him and that he was "beyond hopelessness now[,]" asking Quinn to try to contact a Mr. Reed at Jacksonville to try to avoid a transfer. In his second letter, Frederickson speculated that he might be sent to back to Shawnee or to Pinckneyville Correctional Center ("Pinckneyville"), expressing that he was "living a living hell" but that he would "try to do my best, suck it up, and hopefully come home someday[,]" again expressing a desire for others to intercede with prison officials on his behalf (Doc 108-4 at 11–14).

Hammersly read the letters and felt that they expressed that Frederickson was upset, but Hammersly did not think the letters indicated an imminent risk of suicide (Doc. 108-4 at 6–15; Doc. 108-1 at 8–16). Upon reviewing the fax, Hammersly talked to the warden of Shawnee and was told that Quinn would have to contact Jacksonville (Doc. 108-1 at 9). Hammersly could not directly assist Frederickson because he was no longer in Shawnee, and she was not instructed to notify Jacksonville or to tell Quinn to do so (*Id.*). Amanda Smith also reviewed the fax, also asked what could be done, and was

also told that no action could be taken because Frederickson was no longer at Shawnee (Doc. 118-1 at 38–40). After Frederickson's death, Amanda Smith subsequently characterized the letters as a suicide note in her deposition testimony (Doc. 118-1 at 45). No evidence has been presented that any of the Shawnee staff who reviewed Frederickson's letters took any steps to contact staff at Jacksonville to inform them of the letters. In her fax to Shawnee, Quinn also included a letter addressed to Mr. Reed at Jacksonville.

Frederickson received another mental health evaluation at Jacksonville on June 12, 2015, and a transfer screening was completed on June 13, 2015 (Doc. 110-1 at 45–59, 97). Frederickson was transferred to Pinckneyville on June 17, 2015, where he received another intake screening in which Defendant Nurse Knope noted that his medications were to be continued (*Id.* at 96–97). An evaluation for suicide potential was subsequently conducted on June 18, 2015, and Frederickson was not found to be a current suicide risk (*Id.* at 61–62).

Nine days later, on June 27, 2015, Frederickson was found dead in his cell from an apparent suicide by hanging (Doc. 110-5 at 1–3). Frederickson's former roommate, John Cain, indicated that Frederickson had wanted his own room and had sought to have Cain transferred, filling out a request slip on Cain's behalf in which Cain claimed that he was hearing voices (Doc. 110-5 at 2). Cain was then removed from his cell on June 26 and placed on crisis watch (*Id.*). Inmate Michael Williams, who was in a cell near Frederickson, indicates that at around 12:00 a.m. on June 27, Frederickson was kicking the door of his cell and calling for help, while other inmates taunted him and encouraged

him to kill himself (*Id.*). Williams stated that he saw Frederickson tying what looked like bedsheets together, and that the wing became quiet shortly thereafter (*Id.*). Inmate Willie White was in cell 21, a few doors away from Frederickson, who was in cell 18 (Doc. 118-7 at 1, 7). White stated to prison investigators that he had heard someone a couple cells down telling staff about having suicidal thoughts at the time of the 10:00 p.m. count. Inmate Jody Lagesse, who was also in Frederickson's wing, stated to prison investigators that he had heard Frederickson kicking his door saying "C.O." and that other inmates had told Frederickson to kill himself (Doc. 118-7 at 8). Defendant Nurse Elder stated to prison investigators after Frederickson's suicide that she had given medication to Frederickson the two days prior to his suicide and that he had never indicated to her that he wished to harm himself, and that she was not aware of Frederickson having been denied crisis care (*Id.* at 5).

Defendants Alexander Rodman and Federico Fernandez were correctional officers at Pinckneyville at the time of Frederickson's incarceration there (Doc. 108-8 at 8; Doc. 108-9 at 7). On the night of Frederickson's death, Rodman worked the 3:00 p.m. to 11:00 p.m. shift in Frederickson's wing, doing rounds every thirty minutes and conducting two positive ID counts, which required inmates to come to the front of their cells and identify themselves (Doc. 108-8 at 36–38). Frederickson participated in an ID count at 10:00 p.m. (*Id.* at 39–40). Rodman stated that Frederickson never made any remarks that indicated he was feeling suicidal or expressed a desire for medical or mental health assistance (*Id.* at 42–44). After Rodman's shift, Fernandez worked the 11:00 p.m. to 7:00 a.m. shift (Doc. 108-9 at 7). During this shift, he did rounds in the wing every thirty

minutes (*Id.* at 34–35). At approximately 12:00 a.m., during Fernandez's first count of the shift, he found Frederickson unresponsive in his cell and attempted to assist him (*Id.* at 49–50, 72–73). Fernandez stated that he had not previously had any indication that Frederickson was suicidal (*Id.* at 56, 71). Rodman had gone through annual mental health training as part of his employment, but Fernandez had not yet had any training on mental illness (Doc. 108-8 at 11; Doc. 108-9 at 30–31).

*Plaintiff's Facts on Wexford's Mental Health Care Policies*

Quinn has introduced certain facts regarding Wexford's policies to support her general contention that Wexford's policies resulted in a constitutional violation. While Defendants object to certain of these facts, it is undisputed that Wexford provides mental health services by contract to inmates at certain IDOC facilities. Such care is subject to both Wexford's policies and certain superseding IDOC policies, such as IDOC policies for inmate transfers (Doc. 118-1 at 4; Doc. 120-5 at 10). On one occasion, a Wexford MHP position at Shawnee was unstaffed for more than a year while an employee was on medical leave (Doc. 118-1 at 5). Defendant Hammersly stated that she believed understaffing to be a problem at Shawnee, as in her opinion caseload numbers were too high for the MHPs at that facility (Doc. 120-3 at 16). At Shawnee, during the period of Frederickson's incarceration, there was no on-site psychologist or psychiatrist, and inmates would talk with psychologists remotely via videoconference (Doc. 118-1 at 7).

Psychologists were not required to weigh in on decisions to take inmates off of crisis watch at Shawnee but were needed for discharge treatment planning (*Id.* at 15). MHP Amanda Smith stated that in her opinion, the segregation mental health checks

conducted at Shawnee are different from mental health treatment in the form of longer sessions conducted by MHPs such as Smith and might not be described as treatment (Doc. 118-1 at 20). Similarly, Dr. Kathryn Burns, a psychiatrist retained as an outside expert by Quinn, stated that in her opinion an evaluation of suicide potential of the sort conducted at IDOC facilities such as Shawnee does not constitute psychiatric treatment (Doc. 118-4 at 24). Dr. Burns additionally indicated that in her opinion, certain of Frederickson's medical records indicated that information was not transmitted from prison to prison in a sufficiently organized fashion and that existing transfer procedures did not ensure that personnel at the transferee facility had complete information on an inmate's mental health status (Doc. 118-4 at 26). Dr. Burns additionally criticized the lack of a progress note summarizing Frederickson's treatment and mental state for the transferee institution but noted that all relevant information was in his medical records, which would ultimately be transferred to any transferee institution (*Id.* at 32–33). Wexford does not have policies requiring medical staff at transferor facilities to communicate with transferee facilities about patients with mental health issues, apart from the transfer of medical records (118-8 at 12, 22).

IDOC maintained an Offender Medical Problem List as part of its file on Frederickson, and this list was intended to include all "major significant" medical issues (Doc. 118-1 at 27–28). Amanda Smith stated that this document did not appear to list Frederickson's suicide attempt in February 2013, or his suicide crisis watch on May 27, 2015 (*Id.*). Smith was not aware of any policies that Wexford or IDOC may have had about updating Offender Medical Problem Lists (*Id.*). Smith noted that on certain medical

forms, Dr. Raza on at least one occasion did not indicate how much time he met with the patient. Further, Smith notes that in certain screening documents, which are based on information provided by inmates, a box was checked indicating that Frederickson had never attempted suicide, when in fact he had already attempted suicide in 2013 (*Id.* at 51).

Dr. Roderick Matticks, the Illinois Lead Regional Medical Director for Wexford Health Sources, indicated that he was not personally aware of any requirements regarding documentation of communications between transferring and receiving facilities (Doc. 118-8 at 16). Amanda Smith stated that she did not see any treatment plans or documents indicating that Frederickson received counseling after his transfer to Jacksonville (Doc. 118-1 at 41–42). Smith further noted that she was not aware of any IDOC or Wexford policies regarding MHPs signing off on transfers of inmates receiving psychotropic medications, and that MHPs did not sign off on such transfers (Doc. 118-1 at 32). Dr. Shane Reister, a psychologist employed by the IDOC as Southern Regional Psychologist Administrator for facilities including Pinckneyville, indicated that he did not see any email between the Jacksonville and Pinckneyville facilities summarizing Frederickson's mental health issues (Doc. 118-3 at 29).

In 2013, Dr. Ronald Shanksy was appointed by parties to a civil suit against IDOC to assist the Northern District of Illinois in determining whether IDOC was providing health care service to offenders that met the minimal constitutional standards of adequacy (Doc. 118-12 at 3). The Shanksy Report produced by Dr. Shanksy addressed failings in the health care system as a whole across a wide array of IDOC facilities, not confining its scope to mental health services or to particular prisons (*See* Doc. 118-12).

Dr. Shanksy noted generally that "[l]eadership is a problem at virtually all of the facilities we visited" and that this lack of leadership had resulted in breakdowns in care and harm to patients (*Id.* at 5). Dr. Shanksy goes on to discuss issues with recordkeeping and deficient practices for intrasystem transfers (*Id.* at 13–14). These criticisms are directed at IDOC, not Wexford. Wexford is mentioned only in passing, and largely uncritically (*See, e.g., Id.* at 6). The policies criticized are generally IDOC policies, not Wexford policies, and Shanksy's ultimate conclusion is that it is the State of Illinois that failed to meet constitutional standards, not Wexford (*Id.* at 45).

*Procedural Facts*

Quinn introduced her initial complaint on June 27, 2017, exactly two years after Frederickson's suicide (Doc. 1). She filed an amended complaint on October 13, 2017 (Doc. 19), and a second amended complaint on December 21, 2017 (Doc. 39). Count IV of Quinn's amended complaint was dismissed on September 18, 2018 (Doc. 74), leaving three counts:

| | |
|---|---|
| **Count One:** | Section 1983 claim for deliberate indifference to medical needs against Raza, David, Knope, Elder, Hammersly, Fernandez, and Rodman; |
| **Count Two:** | Section 1983 *Monell* claim against Wexford; and |
| **Count Three:** | Conspiracy claim against Wexford. |

Defendants Fernandez, Hammersly and Rodman filed a Motion for Summary Judgment (Doc. 107) on Count One on August 26, 2019. Defendants David, Elder, Knope, Raza, and Wexford also filed a Motion for Summary Judgment (Doc. 109) on Counts One,

Two, and Three on August 26, 2019. Defendants David, Elder, Knope, Raza and Wexford additionally filed a Motion to Exclude the Expert Report and Testimony of Kathryn A. Burns, MD MPH, on August 26, 2019 (Doc. 111).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

**ANALYSIS**

I.     **Count I: Quinn's Deliberate Indifference Claims Against Raza, David, Knope, Elder, Hammersly, Fernandez and Rodman**

   *A. Applicable Law*

In order to succeed in a claim for deliberate indifference based on inadequate medical treatment, a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant acted with a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

For a medical need to be deemed to present an objectively serious risk of harm, the need must be one that has been diagnosed by a physician, or one that is so obvious that even a lay person could recognize the necessity of medical attention. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). In the past, courts have held mental illness and the possibility of suicide to present a serious and objective risk of harm. *Collins v. Seeman*, 462 F.3d 757, 760–61 (7th Cir. 2006).

To establish that a defendant was deliberately indifferent, a plaintiff must show that officials were aware of the facts from which an inference could be drawn that a serious risk to inmate health exists, and they must also draw the relevant inference. *Farmer*, 511 U.S. at 837. This requires actual knowledge; it is not enough to show that prison officials should have been aware of the risk of harm. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Knowledge of the risk of harm is usually proven by showing that the inmate complained to prison officials about the conditions in question. *Gevas v.*

*McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). A plaintiff need not show that an inmate's complaints and requests for assistance were literally ignored, but only that the officials' responses "were so plainly inappropriate as to permit the inference that the defendant intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). An inmate need not present direct evidence of the official's state of mind, however, and circumstantial evidence can be used to infer an official's knowledge and intent. *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 196 (7th Cir. 2011) (citing *Farmer*, 511 U.S. at 842).

Even if a defendant did disregard certain medical needs, this would only rise to the level of deliberate indifference and result in a constitutional violation if such disregard was "objectively, sufficiently serious" to constitute the "denial of minimal civilized measures of life's necessities." *Langston v. Peters*, 100 F.3d 1234, 1240 (7th Cir. 1996) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). In assessing this, the Court should look to factors including whether any harm actually resulted from the lack of medical attention. *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006).

B. *Discussion*

**Wexford Defendants**

It is undisputed that Frederickson's mental health issues did present a serious medical problem and that Raza, David, Knope, and Elder all had some level of awareness of these problems. But Quinn has failed to present facts indicating that these defendants were indifferent to Frederickson's mental health issues or that Frederickson suffered as a result of any failings on the part of these defendants.

*Raza and David*

The factual record shows that Raza and David both responded adequately to Frederickson's complaints, analyzing his situation and prescribing a course of treatment. They both followed up to ensure that the course of treatment was being followed while Frederickson remained at Shawnee. Raza spoke with Frederickson on many occasions, adjusting his medications several times to accommodate Frederickson's reactions to certain medications. David was a medical doctor, not a psychologist, and he met with Frederickson specifically in response to Frederickson's non-psychological complaints, but David also noted his mental health issues. Neither Raza nor David followed up after Frederickson's transfer, but there is no indication that they were necessarily aware of his transfer. Even if they were, given that Frederickson's medical records were transferred and he was no longer their patient, the lack of follow-up does not seem in any way improper.

*Knope and Elder*

Knope and Elder had limited contact with Frederickson—Knope appears to have met with him on one occasion for his intake screening, and Elder gave Frederickson his medications on the two days prior to his suicide. There is no evidence suggesting that they were indifferent to Frederickson's mental health issues during these interactions, or that they were aware of the imminent risk of suicide.

Overall, there is no indication that any of these defendants was aware that Frederickson had become suicidal in the days leading up to his death. Without exhaustively reciting the facts of this case, none of the evidence presented shows that any

of these defendants ever ignored the medical needs of Frederickson—to the extent that they were aware of them. While their treatment may not always have been perfect, there is no indication that any of the recordkeeping issues alleged by Quinn contributed to Frederickson's suicide. Even if the Court accepts for the sake of argument the premise that some doctors' notes and medical documents were incomplete, the information presented upon transfer in Frederickson's medical records was sufficient to apprise medical staff at transferee facilities of Frederickson's mental issues, and Frederickson's suicide cannot be said to arise from these lapses.

**IDOC Defendants**

*Fernandez*

Fernandez encountered Frederickson dead in his cell in the first count of his shift. There is no indication that he had interacted with Frederickson prior to this or would otherwise have had knowledge of his mental state on the day of his death, and thus he cannot be said to have been deliberately indifferent.

*Hammersly*

Hammersly was shown the fax containing Frederickson's letters sent by Quinn to Shawnee, and thus she had some indication as to Frederickson's mental state. As Frederickson was no longer an inmate at Shawnee, however, Hammersly did not have any responsibility for his mental health care, and for all Hammersly knew, Frederickson might have already been receiving care in his current location. Furthermore, the letters were addressed to Quinn and did not request intervention from Shawnee prison officials. Quinn had also clearly written a letter to Jacksonville, and for all Hammersly knew, she

might already have been in direct contact with that facility. Staff who reviewed the letters were also somewhat divided as to how to interpret them, with some finding them to be a negative indication of Frederickson's mental state and others finding parts of the letters to be more hopeful and forward-looking. Overall, the letters appear to request administrative assistance in avoiding transfer to another facility, not mental health assistance. Hammersly's failure to act after learning of these letters does not constitute deliberate indifference, as she had no responsibility for his mental health care at the time she received them, and in context, the letters may not have sufficed to lead to an inference of a substantial risk of serious harm.

*Rodman*

The only evidence that Rodman had knowledge of Frederickson's mental state is the remarks made by Willie White to prison investigators after Frederickson's death. White told investigators that he had heard an inmate near his cell telling a guard that he was feeling suicidal at the time of the 10:00 p.m. count, when Rodman was on watch. Inmates Michael Williams and Jody Lagesse reported hearing Frederickson banging on his cell and calling for help but do not provide evidence that Rodman actually heard Frederickson and spoke with him. Rodman states that he conducted the 10:00 p.m. count, but did not speak to Frederickson apart from his positive ID, and says that Frederickson never told Rodman that he was suicidal or having mental health issues. Thus, the only evidence supporting Quinn's case is a hearsay record made by an investigator, reporting a hearsay statement made by White to the investigator, about hearsay from an unknown inmate overheard by White. Even if we were to assume that White did overhear

Frederickson, White's statement does not provide Frederickson's exact words, making it difficult to ascertain what an appropriate response would have been. Thus, White's statement has very limited probative value. As the record currently stands, this evidence is simply too vague and circumstantial to outweigh Rodman's deposition testimony, and no reasonable jury could conclude that he was aware of Frederickson's mental health crisis or deliberately indifferent.

Accordingly, the Court grants summary judgment to Defendants Dr. Raza, Dr. David, Nurse Knope, Nurse Elder, Hammersly, Rodman, and Fernandez, and will not proceed to considering their claims of qualified immunity.

II.  **Quinn's *Monell* Claim against Wexford**

   A. *Applicable Law*

Quinn alleges that Wexford violated Frederickson's constitutional rights through policies failing to provide continuity of care upon transfer and policies under which medical staff were indifferent to detainees with serious medical conditions (Doc. 39 at 9). In pursuing a constitutional claim against a private corporation that has contracted to provide essential government services, a plaintiff must show the unconstitutional act alleged was caused by either (1) a person with final policymaking authority; (2) a practice or custom that is widespread and settled among employees of the private entity; or (3) an official policy adopted by the private entity. *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014) (affirming that *Monell* extends to private corporations providing essential government services and specifically to Wexford). Quinn appears to allege that Wexford

has either an explicit policy or alternatively a widespread practice that caused the alleged constitutional violation (Doc. 39 at 9).

To show that Wexford is liable for a harmful custom or practice, a plaintiff must show that policymakers were "aware of the risk created by the custom or practice" and were "deliberately indifferent as to known or obvious consequences" of the practice. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). This requires a showing of actual awareness of facts from which such a risk could be inferred. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Whether the alleged act was caused by an express policy or a customary practice, a plaintiff must show that the policy or custom was the "moving force" behind the injury. *Rice v. Correctional Medical Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). Because the policy must be the moving force behind the injury, there must be a showing of some underlying action or inaction by an agent of the entity in question that caused the constitutional harm. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that where individual police officers had not inflicted any constitutional harm, claim based on police regulations could not succeed).

B. *Discussion*

In her amended complaint, Quinn alleges the existence of an agreement between Wexford and the State of Illinois by which Wexford provides constitutionally insufficient medical care, resulting in flawed care that led to Frederickson's suicide (Doc. 39 at 2). Quinn has not presented any evidence of any explicit agreement or any other explicit policy behind the allegedly insufficient care, so the Court will conclude that this prong of

the *Monell* test cannot be met and move on to consider whether Quinn has presented sufficient evidence of a custom or practice.

In support of her contention that Wexford employees had customs and practices that led to insufficient care, Quinn refers to statements made by individual employees during depositions, testimony from her outside expert, and the Shanksy Report. Together, this evidence falls short of showing a custom or practice held by Wexford employees that resulted in insufficient care. To start, statements from individuals such as Smith, Matticks, and Reister only relate to the personal knowledge of those individuals. The fact that a single individual such as Smith indicates that certain positions at the facility that she worked at were unstaffed for a year, or that the facility did not have an on-site psychiatrist, or that certain information was not listed on Frederickson's offender medical problem list is of limited value in proving that Wexford consistently understaffed positions and that clerical errors and gaps were customary. Even statements by Quinn's expert, Dr. Burns, were largely based on a review of Frederickson's records and are not necessarily indicative of more general customary failings on the part of Wexford. Hammersly's statement that she believed that understaffing was generally a problem at Shawnee does stand out as referring to common practice at that facility, but Hammersly is an IDOC employee, and it is not clear that the understaffing referred to arises solely out of practices on the part of Wexford.

The Shanksy report also refers to broad systemic failings, but it blames these failings on IDOC, not Wexford, and speaks of medical services in general with limited mention of mental health. As discussed, the Court is not certain that the Shanksy report

would even be sufficiently relevant to be admissible at trial, and it might be counterproductive in its tendency to lead a jury to conflate Shanksy's remarks about IDOC with Quinn's allegations about Wexford. Even if the Shanksy Report were admissible, it is of limited probative value, and on its own does not establish customary practices on the part of Wexford. In short, even if *all* of the evidence cited by Quinn in her response were to be found admissible, and even if the Court were to view it in the light most favorable to Quinn's case, there is an extremely thin case for finding a custom or practice for which Wexford could be liable, and the Court does not believe that a reasonable jury could make such a finding.

Even assuming that a jury could find that a customary practice existed, there is no evidence of deliberate indifference on the part of Wexford. While certain individual employees may have noted customary failings, this knowledge cannot be imputed to the organization as a whole. Shanksy's report dealt with IDOC and would similarly not have put Wexford on notice as to any facts from which a risk could be inferred. Even to the extent that Wexford may have been aware of problems with staffing or paperwork, facts do not show that Wexford was indifferent to these problems. While transfer paperwork was not always filled out correctly, Wexford did have forms which medical personnel were supposed to fill out upon transfer, and it also had a practice of intake examinations at new facilities and transferred inmate medical records. While Wexford did not always fill vacancies promptly, there is no indication that Wexford "agreed to understaff the prisons" as Quinn alleges (Doc. 39 at 4). Showing deliberate indifference is a high hurdle, and Quinn has not crossed it.

Even if deliberate indifference could be found, there is no evidence that any customary practice was the moving force behind Frederickson's suicide. While there may have been some understaffing, Frederickson was seen repeatedly by MHPs and psychologists who prescribed him several courses of treatment. He appears to have been seen relatively promptly upon request. While doctors' notes and transfer paperwork may occasionally have contained clerical errors or not been as thorough as they might have been, the combined transfer of his medical records and intake screening indicates that medical professionals at each facility to which Frederickson was transferred were sufficiently apprised of his health situation and remedying any minor failings would not ultimately have aided in preventing his suicide. The fact is that upon transfer from Shawnee, Frederickson was believed to be in a relatively stable condition and had been removed from crisis watch—even if procedures for transfer involved more contact between MHPs at the facilities, this would not have put staff at Jacksonville or Pinckneyville on notice of Frederickson's impending suicide.

Accordingly, because Quinn has failed to show evidence of a custom or practice, deliberate indifference, or causation, the Court grants summary judgment to Wexford.

## III. Count Three: Conspiracy Claim Against Wexford

There is no evidence in the record that provides the slightest indication of any express, unwritten agreement between the State of Illinois and Wexford to "violate the Constitution through knowingly providing inadequate medical care to inmates in Illinois prisons[,]" as Quinn alleges (Doc. 39 at 11). Quinn has not presented any facts on this point in her Response to Defendant Wexford's Motion for Summary Judgment. Indeed,

the discovery materials presented by Quinn do not show signs that Quinn has made any efforts to find evidence of a conspiracy, raising doubts as to whether she and her counsel seriously believed in the veracity of her own claims. Accordingly, the Court grants summary judgment to Wexford on this count. The Court further cautions Quinn and her counsel against bringing unfounded and frivolous claims before this or any other court. *See generally* FED. R. CIV. P. 11(c)(1); Ill. R. Prof. Conduct 3.1.

CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment to all Defendants and **DISMISSES** this action **with prejudice**. The Court **DIRECTS** the Clerk of Court to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:**   **February 24, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**